# RICHARD H. ROSENBERG
## ATTORNEY AT LAW

217 BROADWAY
SUITE 707
NEW YORK, NEW YORK 10007

TEL: 212-586-3838
FAX: 212-962-5037
richrosenberg@msn.com

January 4, 2023

Hon. Edgardo Ramos
United States District Judge
United States District Court
Southern District of New York
40 Foley Square
New York, NY 10007

**Re:  United States v. Almaleh,**
**17-CR-025 (ER)**

Dear Judge Ramos:

Please accept this letter on behalf of Issak Almaleh, who will appear before the Court for sentencing on January 18, 2023, following his conviction of (1) conspiracy to commit mail and wire fraud, (2) mail fraud, (3) wire fraud, and (4) submission of a false application for federal deposit insurance to the Federal Deposit Insurance Corporation (FDIC). Mr. Almaleh maintains his innocence and intends to appeal. But he recognizes that the jury's verdict means that the Court will impose a sentence.

The PSR calculates that Mr. Almaleh's advisory Sentencing Guidelines range is 87-108 months of imprisonment and recommends a sentence of 60 months to run concurrently on each count. Mr. Almaleh has already spent approximately 30 months in pretrial detention, from September 27, 2017, to March 24, 2020. A sentence of 60 months (51 months, assuming 15% good time credit), would result in the remand of Mr. Almaleh for an additional term of approximately 15 months in prison before halfway house eligibility.

Mr. Almaleh suffers from a long list of health conditions including hypertension, Type II diabetes, abnormal vision, difficulty hearing and walking, spinal stenosis, osteoarthritis, urinary incontinence, hypothyroidism, hypomagnesaemia, and anxiety. He uses a cane and a battery-powered hearing device.

Consistent with the mandate of 18 U.S.C. § 3553(a), we ask the Court to consider Mr. Almaleh's poor health, the difficulty of obtaining appropriate medical treatment at Bureau of Prisons facilities, and the 30 months he has already spent in pretrial detention before concluding that any additional period of incarceration would be greater than necessary to serve the goals of sentencing.

In addition, we ask the Court to re-evaluate the PSR's advisory Sentencing Guidelines calculation and to conclude that, consistent with USSG § 2B1.1 and this Circuit's case law concerning loss calculation, Mr. Almaleh's Guidelines should be based on the actual loss caused to the victims who rented properties as a result of the defendants' assertions of ownership, not on the assessed fair market value or consideration paid for the properties at issue, as to which there is inadequate evidence in the record.

We note, for the Court's consideration, the Third Circuit's persuasive en banc holding in *United States v. Banks*, 2022 WL 17333797 (3d Cir. Nov. 30, 2022), instructing that "loss" for the purposes of the Sentencing Guidelines includes only actual, not intended, loss. Although the Second Circuit has not yet joined *Banks*, the Second Circuit has instructed on multiple occasions that loss is a poor proxy for offense severity and has cautioned against sentencing based predominantly on USSG § 2B1.1's loss table. For Mr. Almaleh, a loss calculation based on actual loss would result in an advisory Sentencing Guidelines range of 18-24 months of imprisonment, i.e., less time than he has already spent in pretrial detention.

In sum, we urge the Court to conclude that a sentence of time served with a period of supervised release would be more than sufficient to serve each of the goals of sentencing, and that any sentence of imprisonment would violate the parsimony clause of 18 U.S.C. § 3553(a).

**Offense Conduct**

A jury convicted Mr. Almaleh and his wife Antoaneta Iotova of all four counts in the Superseding Indictment on March 17, 2022. As summarized in the Presentence Report ("PSR"), the offense conduct consisted of a "wide-ranging scheme" in which the defendants "used forged documents to claim ownership of more than $5.7 million worth of property in New York and Florida and then used those real estate documents to victimize individuals." PSR at ¶ 13. Specifically, the jury found that the defendants posted rental advertisements for properties for which they had "falsely claimed ownership after creating fraudulent deeds" and rented the properties to individuals who responded to the advertisements. PSR at ¶ 14. In each case, the renters were promptly evicted from the properties by the police after the true owners lodged complaints. *Id.* The defendants also submitted an application on behalf of the company they claimed to manage, Deutsche Bank National Trust Company, to the FDIC for insurance. PSR at ¶ 17. The application contained statements that the jury found to be false. *Id.* The Court presided

over the trial and is fully familiar with the evidence at trial, including the testimony of Mr. Almaleh and his wife, who took the stand in their own defense.

## Guidelines and Loss Calculations

The PSR calculates a $5.7 million intended loss attributable to the defendants' conduct "based on the assessed value or consideration paid for each of the approximately 29 properties over which Almaleh and Iotova falsely claimed ownership." PSR at ¶ 24. Further, the PSR concludes that the fraud "affected at least 26 individual victims and approximately 16 victim companies. At least five or more of the individual victims experienced substantial financial hardship in that they were evicted from the properties and became homeless." *Id.* The PSR calculates an actual loss to the individual victims of $24,639.47 for which restitution must be ordered pursuant to the Mandatory Victims Restitution Act of 1996. PSR at ¶ 25.

Based on those numbers, the PSR concludes that Mr. Almaleh's advisory Sentencing Guidelines range is 87 to 108 months (CHC I, level 29) (PSR at ¶¶ 30-39, 78):

| | |
|---|---|
| Base offense level<br>USSG §§ 2X1.1(a) and 2B1.1(a)(1) | 7 |
| Intended loss of approximately $5.7 million<br>USSG § 2B1.1(b)(1)(J) | +18 |
| Substantial financial hardship to more than five victims<br>USSG § 2B1.1(b)(2)(B) | +4 |
| Total offense level | 29 |

Mr. Almaleh objects to the PSR's use of intended loss to calculate his advisory Sentencing Guidelines range. First, the victims for purposes of the loss calculation were the 11 individuals who rented properties from the defendants. Accordingly, the actual loss figure of $24,639.47 should be used for his advisory Sentencing Guidelines range calculation. Second, the PSR's $5.7 million figure, which is based on "assessed value or consideration paid" for "approximately 29" properties, is an unreasonable and unreliable estimate. Third, the Third Circuit's persuasive opinion in *United States v. Banks*, 2022 WL 17333797 (3d Cir. Nov. 30, 2022), supports a loss calculation based on actual loss. Finally, even if the Court concludes that use of the $5.7 million figure is reasonable, this Circuit has often instructed that loss is an inaccurate and disfavored proxy for the severity of criminal conduct.

1. The Victims of the Fraud Scheme Were the Renters.

"Under the Guidelines, the offense level for fraud offenses is linked explicitly to the harm caused to victims, measured in terms of monetary loss." *United States v. Constantine*, 762 F. App'x 16, 18–19 (2d Cir. 2019) (quoting *United States v. Byors*, 586 F.3d 222, 225 [2d Cir. 2009] [citing U.S.S.G. § 2B1.1 (b)]).

The victims in this case were the renters whose money the defendants took as deposits on rental properties that the defendants purported to own. *See*, *e.g.*, Trial Transcript (Gov't. summation) at 1115-16 (discussing F'lesson Wood text messages and arguing that, "the defendants lied to the victims, they lied on fake deeds, and . . . they lied to the FDIC all to carry out a scheme to defraud innocent victims out of their savings."); 1118 ("Third, after creating deeds for dozens of properties they didn't own, the defendants rented those properties to innocent victims in exchange for cash."); 1121 ("Every time a victim told them that the police had kicked the victim out of one of the defendants' so-called rental properties, these defendants knew that their actions were wrong."); 1130 ("You heard about what happened to the victims who rented homes from these defendants."). The actual loss to the victims who paid money to rent properties from which they were subsequently evicted is $24,639.47. PSR at ¶ 25.

Substituting this actual loss figure in the Guidelines calculation results in a 4-level increase for loss under USSG § 2B1.1(b)(1)(C), and a total offense level of 15. In CHC I, level 15 equates to an advisory Sentencing Guidelines range of 18-24 months, which the Defense submits is a reasonable starting point for the Court's consideration.

2. The PSR's Intended Loss Approximation Is Unreasonable.

USSG § 2B1.1 requires a "reasonable estimate" of loss. USSG § 2B1.1 App. N. 3(C).[1] The court "need not establish the loss with precision but rather need only make a reasonable estimate of the loss, given the available information." *United States v. Anselm*, 610 F. App'x 64, 66 (2d Cir. 2015) (quoting *United States v. Carboni*, 204 F.3d 39, 46 (2d Cir.2000) (internal quotation marks omitted in *Anselm*)). The Government bears the burden of proving the loss amount to support a Guidelines increase. *See*, e.g*., United States v. Capanelli*, 270 F.Supp.2d 467, 471 (S.D.N.Y. 2003) (discussing loss calculation under USSG § 2B3.1 and referencing *United States v. Vasquez*, 791 F.Supp. 348, 353 (E.D.N.Y. 1992), which discusses loss calculation under USSG § 2B1.1).

The PSR asserts that the intended loss is "approximately $5.7 million" "based on the assessed value or consideration paid for each of the approximately 29 properties over which Almaleh and Iotova falsely claimed ownership." PSR at ¶¶ 31, 24.  This figure is not reasonable. The PSR's use of the "assessed value" of some unknown percentage of the "approximately 29 properties" is unreasonable because the Government has not provided the basis for the assessment. Further, the amount of "consideration paid" according to the trial record is far lower.

With respect to a few of the properties in issue, Ms. Iotova testified that she paid relatively small amounts after having – she believed – won the properties at auction. See, e.g., Trial Trans. at 939, 941. At most, the "consideration paid" for the properties in question,

---

[1] The Defense acknowledges the seeming inconsistency in relying on the commentary here while arguing *infra* that the commentary should be disregarded. The two arguments may be harmonized by reference to the Defense's overarching argument: that the actual, accurately calculable loss to the true victims in this case should be the measure of loss applied in calculating the advisory Sentencing Guidelines range for Mr. Almaleh, and that anything else is unreasonable.

according to Ms. Iotova's testimony, totaled $32,319, or an average of $6,463.80 per property, including the Almaleh/Iotova family residence, as to which there is no allegation of unlawful rental.[2] Multiplying this average figure by 28 – assuming, *arguendo*, the accuracy of the PSR's assertion that "approximately 29 properties" were involved in the scheme, less the one property at 2307 Washington Street where the defendants resided – results in a total of $180,986.40, which is not even close to the $5.7 million the PSR claims as "intended loss." See PSR at ¶ 31, 24.

The Second Circuit has approved the use of short-sale prices as reasonable estimates of loss. *See*, *e.g.*, *United States v. Nawaz*, 555 F. App'x 19, 25-26 (2d Cir. 2014) (referencing *United States v. Lacey*, 699 F.3d 710, 720 (2d Cir. 2012) (discussing loss calculation in a mortgage fraud case). Here, Mr. Almaleh submits, it would be no less reasonable to use the $6,463.80 average consideration paid – the amount established by the trial record – to calculate the appropriate Guidelines increase for loss according to USSG § 2B1.1. If the Court were to adopt this basis for the loss calculation, a loss amount of $180,986.40 would result in an increase of 10 levels to the base offense level (USSG § 2B1.1(b)(1)(F)), and a resulting total offense level of 21, with a corresponding advisory Sentencing Guidelines range of 37-46 months of incarceration.

   3.   The Third Circuit's Banks Opinion Supports Use of Actual, Not Intended, Loss

Following the Third Circuit's persuasive opinion in *United States v. Banks*, 2022 WL 17333797 (3d Cir. Nov. 30, 2022), which was handed down after the PSR was prepared, the Defense submits, however, that the advisory Sentencing Guidelines should be based on actual, not on intended loss.

*Banks* held that *Kisor v. Wilkie*, 139 S.Ct. 2400 (2019), revised the standard of deference due to the Sentencing Commission's interpretive commentary. *Banks*, 2022 WL 17333797, at *5. Explaining that "[t]he judge's lodestar must remain the law's text, not what the Sentencing Commission says about the text," the Third Circuit concluded that USSG §2B1.1's definition of "loss" includes only actual, not intended, loss. *Id.*, at *6. "Because the commentary expands the definition of 'loss' by explaining that generally 'loss is the greater of actual loss or intended loss,' we accord the commentary no weight." *Id.*, at *7.

The Second Circuit has rejected prior invitations to revisit its deference to the Sentencing Guidelines commentary, even after *Kisor*, albeit it only in the context of challenges to USSG § 4B1.2 App. N. 1. *See*, *e.g.*, *United States v. Wynn*, 845 F. App'x 63, 65–66 (2d Cir. 2021), *as*

---

[2] This figure is derived from using the amounts found in the trial transcript: $7,300 for 2307 Washington Street (the property in which the Almaleh/Iotova family lived) (Trial Trans. 933); $7,594.50 for 26-27 NW 33 St, Unit 2209 (Trial Trans. 936) (but see also Trial Trans. 937 noting that the "consideration paid" for the 26-27 NW 33 St property was $7,800); $10,119 for 10659 SW 113th Place, 83B (Trial Trans. 938) (but see Trial Trans. 939 noting that the amount paid for the property was $10,100); $1,100 for 11930 N. Bayshore Drive Apartment 904 (Trial Trans. 939-940); $6,000 for 654 Woodgate lane, Unit C (Trial Trans. 941). Where two different amounts appear in the transcript for a given property, the larger has been used in this calculation.

*amended* (Apr. 1, 2021), *cert. denied*, 211 L. Ed. 2d 570, 142 S. Ct. 865 (2022) (referencing *United States v. Tabb*, 949 F.3d 81, 88 (2d Cir. 2020); *United States v. Richardson*, 958 F.3d 151, 154 (2d Cir. 2020)). To the best of the Defense's knowledge as of the date of this memorandum, the Second Circuit's treatment of USSG § 4B1.2 and its commentary has not been expanded to the interrelationship of other Guidelines and their commentary; nor has the Second Circuit issued an opinion considering *Banks*'s treatment of actual versus intended loss. However, we submit that *Banks*'s analysis is persuasive and provides further support for an advisory Sentencing Guidelines calculation premised on the actual loss of $24,639.47 to the victims in this case.

4.   Use of Loss as a Proxy for the Severity of Criminal Conduct Is Disfavored.

The Second Circuit has recognized that loss is a poor proxy for culpability. The loss table contained within USSG §2B1.1(b) provides a series of two-level increases to the base offense level of 7, depending on the amount of loss caused by the wrongful conduct. While calculation of the loss attributable to the offense of conviction is, therefore, an integral step in the Guidelines calculation that a sentencing judge is required to perform (see *United States v. Crosby*, 397 F.3d 103, 111-12 (2d Cir. 2005)), USSG §2B1.1(b)'s loss table has been repeatedly criticized for its unfair aggravation of the guidelines range and failure to provide an accurate picture of the defendant's culpability.

Indeed, the loss table was not based on pre-Guidelines practice, nor does it have an empirical basis. See U.S. Sentencing Commission, "Supplementary Report on the Initial Sentencing Guidelines and Policy Statements," (1987) ("Supplementary Report") (discussing disagreement concerning an underlying philosophy for the Guidelines). Instead, "the Commission, either on its own initiative or in response to congressional actions, established guideline ranges that were significantly more severe than past practice" for the most frequently sentenced offenses in the federal courts, including white collar offenses. See U.S. Sentencing Commission, "Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform," at 47 (2004) (citation omitted).

Unsurprisingly, the loss guideline has been widely criticized for its substantive failings and unfairness. *See*, *e.g.*, *United States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006); *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427-28 (S.D.N.Y. 2004); *United States v. Gupta*, 904 F.Supp.3d 349, 351 (S.D.N.Y. 2012); Derek R. Vollrath, "Losing the Loss Calculation: Toward a More Just Sentence Regime in White-Collar Criminal Case," 59 Duke L.J. 1001, 1025 (2010); Frank O. Bowman III, "Sentencing High-Loss Corporate Insider Frauds after Booker," 20 Fed. Sent. R. 167, 169, 2008 WL 2201039 at *4 (Feb. 2008).

In *United States v. Algahaim*, 842 F.3d 796 (2d Cir. 2016), the Second Circuit discussed the loss guideline and noted that the Commission, "could have started the Guidelines calculation for fraud offenses by selecting a base level that realistically reflected the seriousness of a typical fraud offense and then permitted adjustments up or down to reflect especially large or small amounts of loss." *Algahaim*, 842 F.3d at 800. Instead, adding to a low base offense level by amount of loss makes the "amount of loss" "the principal determinant of the adjusted offense

level and hence the corresponding sentencing range." *Id*. The Court remanded the case "to permit the sentencing judge to consider whether the significant effect of the loss enhancement, in relation to the low base offense level, should result in a non-Guidelines sentence." *Id*. We urge this Court to similarly consider whether the loss amount unwarrantedly drives the offense level far higher than is warranted here.

Accordingly, even considering a loss of $5.7 million with an advisory sentencing range of 87-108  months, the Defense respectfully requests that the Court impose a sentence of time served given that the loss-driven advisory guidelines range does not truly capture the offense conduct or provide adequate guidance for sentencing here, especially in light of the history and characteristics of Mr. Almaleh, his long pretrial detention, and the serious health concerns compelling leniency under 18 U.S.C. § 3553(a).

### The History and Characteristics of Issak Almaleh

Mr. Almaleh was born in Sofia, Bulgaria in 1953 and lived in that country most of his life. His parents were very young at his birth – his mother was 17 and his father 20 years old – and the family struggled to survive. The family occupied just one room of an apartment shared with multiple other families, and often had little to eat. The PSR (¶¶ 48-54) summarizes his early years including experiences of religious persecution and employment discrimination, the early death of his father, and his early marriages.

In 1989, after the dissolution of the Soviet Union, Mr. Almaleh immigrated to Israel, where he had family members. He worked there in the jewelry industry, despite having trained in Bulgaria as an electrician, until returning to Bulgaria in 1994. Trial Trans. at 785-86. At some point thereafter, he met and married Ms. Iotova, and the couple had two daughters. During this period, Mr. Almaleh injured his back and underwent a surgery that left him paralyzed for two to three years. PSR at ¶ 60. He had to re-learn how to walk and still experiences pain in his back and difficulty sitting or standing for long periods. *Id.*

Then, in 2009, the family won the green card lottery to immigrate to the United States. Mr. Almaleh is now a United States citizen, but in many ways his struggles have continued. Mr. Almaleh currently lives in a shelter in Manhattan. He has developed numerous health conditions including hypertension, Type II diabetes, abnormal vision, difficulty hearing and walking, spinal stenosis, osteoarthritis, urinary incontinence, hyperthyroidism, hypomagnesaemia, and anxiety. See PSR at ¶¶ 61, 63. He "believes he has melanoma and dementia," reporting that he has had COVID-19 twice and "at times has memory loss."[3] PSR at ¶ 62. He takes a long list of medications for these conditions. PSR at ¶ 63.

---

[3] We note that a mental competency examination performed in 2019 while Mr. Almaleh was incarcerated at the Metropolitan Detention Center identified no concerns with his competence to stand trial. It is unclear to counsel whether his situation has materially deteriorated in the intervening years.

Mr. Almaleh receives Social Supplemental Income, food stamps, and cash assistance. PSR at ¶ 70. Despite a substantial work history as an electrical engineer, he is unable to work because of his failing health.

## Legal Framework for the Sentencing Decision

As the Court is well aware, 18 U.S.C. § 3553(a) instructs the sentencing judge to impose a sentence that is "sufficient, but not greater than necessary" to (A) reflect the seriousness of the offense, promote respect for the law and provide just punishment for the offense, (B) afford adequate deterrence to criminal conduct; (C) protect the public from further crimes of the defendant; and (D) provide the defendant with needed education or vocational training, [and] medical care. 18 U.S.C. § 3553(a)(2). *See Kimbrough v. United States*, 552 U.S. 85, 110 (2007); *United States v. Cavera*, 550 F.3d 180 (2d Cir. 2008).

Considerations affecting the sentence to be imposed include: (1) the guideline range; (2) the policy statements of the Sentencing Commission; (3) the nature and circumstances of the offense, and a history of the defendant; (4) any need for sentence to further purposes of deterrence, protective or rehabilitative functions; (5) the kinds of sentences available; (6) the need to avoid unwarranted sentencing disparities among defendants with similar records and conduct; and (7) the need to provide restitution to the victims. 18 U.S.C.§ 3553(a)*. Above all else, sentencing must be individualized. *Pepper v. United States*, 562 U.S. 476, 487–88 (2011). *See also Williams v. People of State of N.Y.,* 337 U.S. 241, 247 (1949) ("[T]he punishment should fit the offender and not merely the crime.").

## Discussion:
## A Sentence of Time Served Would Satisfy All of the Goals of Sentencing

Mr. Almaleh will be 70 years old this spring.  He spent 30 months in pretrial detention before being released in the early days of the COVID-19 pandemic. For Mr. Almaleh, suffering from multiple health concerns including self-diagnosed memory loss and dementia, any additional period of incarceration would be greater than necessary to serve the goals of sentencing.

As discussed above, loss is a poor proxy for the severity of offense conduct. The Sentencing Guidelines, without a loss enhancement, would result in a relatively low advisory Sentencing Guidelines range of 8-14 months, which Mr. Almaleh has served more than twice over. But even if the Court finds it appropriate to increase Mr. Almaleh's advisory Sentencing Guidelines range based on the loss to the victims in this case, he has already served a term of imprisonment greater than the top of the advisory range.[4]

If the Court instead uses the "reasonable estimate" of $180,986.40 based on Ms. Iotova's testimony at trial, then Mr. Almaleh has – giving him full 15% good time credit – served nearly all of the low-end sentence of 37 months at an advisory Sentencing Guidelines level of 21.

---

[4] Level 15, CHC I = 18-24 months

In requesting a sentence of time served, we note that the United States Sentencing Commission's Interactive Data Analyzer informs that, in the Second Circuit in 2021, 62.8% of all defendants in CHC I sentenced under USSG § 2B1.1 received sentences of up to 24 months, while an additional 16% received sentences between 24 and 59 months.[5] Data for 2022 is not yet available. There is nothing about Mr. Almaleh's history or his conduct here that warrants a greater punishment than the vast majority of defendants who share his criminal history category and offense type.  Based on these statistics, Mr. Almaleh's request for time served is reasonable and would be proportionate to the sentences imposed on similarly situated defendants.

The Court should also consider that Mr. Almaleh's infirmities and the difficulty of obtaining adequate medical care within the Bureau of Prisons made his pretrial detention harsher than usual and would make any additional term of imprisonment correspondingly harsher and more arduous than the same period of time would be if served by an individual in good health.

Although the BOP nearly always claims to be able to provide medical care for any condition, the Department of Justice's own internal audits detail the abysmal medical care most federal inmates actually receive.  For example, a report by the Department of Justice's Office of the Inspector General found that the BOP often does not provide required medical services to inmates.  *See The Federal Bureau of Prisons' Efforts to Manage Health Care* (2008) at 32-34.  As one example, this report cites an inmate who was referred to the chronic care clinic upon intake but was not seen until five months later. When he was seen, an EKG performed at that time showed abnormal results which were not reviewed by a doctor until two days later -- the day the inmate died of a heart attack. *Id*. at 33.

The same report further found that preventive services are often not provided, chronic conditions and medication side effects are often not monitored, and unqualified persons are providing services. *Id*. at ii-xx, 32-34, 51-52. At several institutions, the BOP has allowed medical practitioners to perform medical services without valid authorizations, privileges, or protocols.  *Id*. at 48-49.  There is also anecdotal evidence of serious lapses in care. *See*, *i.e., Lopez v. United S*tates, 2005 WL 2076593 (E.D.N.Y. 2005) (former inmate awarded $1 million for late-stage throat cancer where repeated requests to see a specialist were ignored for nearly two years, requiring removal of his voice box).

A second Department of Justice Report, *Correctional Health Care: Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates* (2004) concluded that offenders' health problems before and during incarceration accelerate their aging processes to an average of 11.5 years older than their chronological ages after age 50.  *Id*. at 10. *See also* Natalie Hinton, *Comment*, *Curing the BOP Plague with Booker: Addressing Inadequate Medical Treatment in the Bureau of Prisons,* 41 J. Marshall L. Rev. 219, 247 & n. 133 (2007) ("BOP's consistent claim that it can address all medical needs of inmates has not proven true"; and "because of rampant overcrowding, underfunding and understaffing, the "quality" and availability of BOP health care have "plummeted,"" *id.* at 232–33 n. 60); Eldridge, Elizabeth, *Why Prisoners Get the Doctors No One Else Wants,* The Appeal*,* Nov. 8,

---

[5] USSC Interactive Data Analyzer, available at: https://ida.ussc.gov/analytics/saw.dll?Dashboard

2019, (finding that "correctional healthcare is fraught with conditions that allow problematic doctors to flourish").

The Bureau of Prisons is also poorly equipped to care for older inmates like Mr. Almaleh. A report by the Department of Justice Office of Inspector General, *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons* (revised Feb. 2016) found:

- Aging inmates are more costly to incarcerate than their younger counterparts due to increased medical needs;

- Limited institution staff and inadequate staff training affect the BOP's ability to address the needs of aging inmates;

- The physical infrastructure of BOP institutions limits the availability of appropriate housing for aging inmates;

- The BOP does not provide programming opportunities designed specifically to meet the needs of aging inmates; and

- Aging inmates engage in fewer misconduct incidents while incarcerated and have a lower rate of re-arrest once released.

Even assuming that the medical care Mr. Almaleh would receive from the BOP would be minimally adequate, there is no question that the time in jail for one with chronic and debilitating medical conditions is far more difficult than for healthy inmates. An infirm defendant's shorter life expectancy supports leniency based on the sentencing goals of proportionality and avoiding unwarranted sentencing disparities. *See*, *e.g., United States v. Marsh*, 820 F. Supp. 2d 320 (S.D.N.Y. 2011) (year-and-a-day sentence for a 52-year-old defendant with heart disease and related conditions despite Guideline range of 108-135 months because, among other things, "defendant's many health problems will … make it harder for him to serve a prison term"); *United States v. Gigante,* 989 F. Supp. 436, 443 (E.D.N.Y. 1998) (pre-*Booker*, departing from 262 months to 144 months for mob boss with a diminished life expectancy due to his medical issues and advanced age, because prison is "significantly harder [for a sick defendant] to endure", and his life would be both "threatened and shortened" by incarceration). Given Mr. Almaleh's age of 69, and his poor health, any prison term is a larger portion of his remaining years than it is of a younger offender's.

Courts have imposed sentences well below the advisory Guidelines in several cases where a defendant suffers from serious health conditions. For example, in *United States v. Scholar*, 252 F.Supp.3d 711, 714 (WI E.D. 2017), the defendant had prior drug convictions and was involved in drug trafficking as part of a racketeering enterprise. Despite advisory Guidelines of 87-108 months, the court imposed a sentence of time served, three years supervised release and one-year home confinement based in part upon the seriousness of defendant's health conditions. In *United States v. Edwards,* 595 F.3d 1004, 1011 (9th Cir. 2010), the Court granted a downward variance so that the defendant could continue to receive uninterrupted medical treatment outside of prison. On appeal, the Ninth Circuit affirmed the probationary sentence for

bankruptcy fraud and making false statements—notwithstanding the 27-33-month Guidelines—for a 63-year-old defendant *with a prior criminal record.* The court reasoned that while the BOP was capable of providing Edwards' medical care, a sentence of probation would satisfy the requirement of providing needed care in the most effective manner. 18 U.S.C. § 3553(a)(2)(D).

In *United States v. McFarlin*, 535 F.3d 808 (8th Cir. 2008), the Eighth Circuit affirmed a probationary sentence for a defendant who pled guilty to conspiracy to distribute 102 grams of cocaine based in part upon serious health issues. *See also United States v. Baron*, 914 F. Supp. 660 (D. Mass. 1995) (pre-*Booker*, defendant convicted of bank fraud with Guidelines of 27-33 months was sentenced to one year probation, with six months to be served on home detention, since incarceration would risk rapid deterioration of defendant's interrelated medical conditions); *United States v. Willis*, 322 F.Supp.2d 76 (D. Mass 2004) (pre-*Booker*, defendant plead guilty to failing to report income derived from his illegal gambling business and failing to file tax returns, the court departed from level 17 to level 10, in order to impose a sentence of probation, where it found that the 69-year-old defendant suffered from numerous medical conditions).

Finally, we note that Mr. Almaleh's attempts to obtain medical care are further complicated by his limited English. Whereas hospitals such as NYU Langone have provided a Bulgarian translator to assist Mr. Almaleh's doctors in discussing his conditions and plan of treatment, it is unlikely that the Bureau of Prisons would be similarly able to communicate with Mr. Almaleh in a language that he could understand.

### Conclusion

Considering the 30 months that Mr. Almaleh has already spent in pretrial detention and the advisory Sentencing Guidelines range corresponding to the actual loss that Mr. Almaleh's conduct caused to the true victims, we ask the Court to impose a sentence of time served so that Mr. Almaleh can receive adequate medical care for his numerous health concerns. A period of supervised release with the conditions set forth in the PSR's sentence recommendation would sufficiently address the need to protect the public, the need for deterrence, and the need to provide any rehabilitative services, while allowing him to remain in the care of his own doctors.

Thank you for your consideration of this submission and for continued courtesies to counsel.

Respectfully,
_____/s/_____
Richard H. Rosenberg, Esq.

_____/s/_____
Clara Kalhous, Esq.

Cc:    All counsel (by ECF)

11