

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

January 11, 2023

**BY ECF**
The Honorable Edgardo Ramos
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

Re:   *United States v. Issak Almaleh*, 17 Cr. 25 (ER)

Dear Judge Ramos:

The Government respectfully submits this letter in advance of the sentencing of the defendant, Issak Izrael Almaleh. For the reasons explained below, the Government submits that a below-Guidelines sentence of at least 60 months' imprisonment would be sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing.

I.     **Background**

       **A.  The Scheme**

From in or about March 2011 through in or about September 2017, Almaleh and his wife Antoaneta Iotova engaged in a wide-ranging scheme in which they used forged documents to claim ownership of more than $5.7 million worth of property in New York and Florida and then used those real estate documents to victimize individuals. (PSR ¶ 13.)[1] Specifically, the defendants identified properties that had been subject to foreclosure and were owned by various financial institutions, including Deutsche Bank National Trust Company ("DBNTC"). (PSR ¶ 13.) Next, the defendants filed fraudulent and forged property deeds purporting to transfer ownership of approximately 29 or more real properties located in New York City and Florida from several financial institutions, such as DBNTC, to entities created and controlled by the defendants, including New York Sport Foundation, New York Mortgage Corporation, Women in International Relations, Inc., and American Diabetes Foundation. (PSR ¶ 13.) Almaleh, who was a commissioned notary, often falsely notarized the documents as if they were genuinely signed by

---

[1] Citations to PSR ¶__ are to the Presentence Investigation Report (ECF No. 524) filed by the Probation Department on August 23, 2022.

representatives of the financial institutions.  (PSR ¶ 13.)  At least 16 companies were defrauded by the defendants' scheme.  (PSR ¶ 24.)

Almaleh also signed the documents, falsely representing that he was a purported officer of the financial institution.  (PSR ¶ 13.)  For example, Almaleh signed several documents falsely claiming he was Vice President of DBNTC.  (PSR ¶ 13.)  As Almaleh admitted to the Probation Department, however, he has been unemployed for the last 25 years.  (PSR ¶ 69.)  Iotova also signed the documents on behalf of the entities controlled by the defendants to facilitate the fraudulent property transfers.  (PSR ¶ 13.)

## B.  The Individual Victims

After the defendants filed fraudulent deeds purporting to transfer ownership of the properties, they used the fraudulent deeds to victimize at least 26 individual victims.  (PSR ¶¶ 14, 24.)  On multiple occasions, victims responded to online rental advertisements posted by the defendants, in which the defendants falsely claimed authority to rent certain properties to tenants.  (PSR ¶ 14.)  The fraudulent advertisements were for properties for which the defendants had falsely claimed ownership after creating fraudulent deeds that purportedly transferred the properties from DBNTC to companies owned by the defendants.  (PSR ¶ 14.)  After these victims, fooled by the advertisements and by the defendants' representations that they owned the properties, paid the defendants "rent" for properties the defendants did not own, the victims were evicted by the police after complaints were lodged by the lawful owners of the properties.  (PSR ¶ 14.)

For example, in April 2015, one victim ("F.W."), his mother ("J.P.") and the rest of their family, who were homeless at the time, agreed to rent a property in Florida from the defendants that the defendants pretended to own.  (PSR ¶ 15.)  F.W. and J.P. paid the defendants approximately $2,400 up front to rent the home.  (PSR ¶ 15.)  Shortly after moving into the property, however, F.W. and J.P. were kicked out of the home they believed they were renting from the defendants because the lawful owner of the property called the police. (PSR ¶ 15.)  The police accused F.W., J.P., and the rest of their family of being squatters, and told them that they had to move out.  (PSR ¶ 15.)  F.W., J.P., and the rest of their family were rendered homeless again due to the defendants' conduct.

Similarly, another victim ("D.T.") and her husband agreed to rent a home in Florida from the defendants.  (PSR ¶ 16.)  The defendants, acting under false names "Michael" and "Ana," told D.T. and her husband that they owned that home.  (PSR ¶ 16.)  D.T. and her husband paid the defendants approximately $1,600 up front to rent the home and signed a lease provided by the defendants.  (PSR ¶ 16.)  On the same day that D.T. and her husband moved into the property, however, they were kicked out by the police. (PSR ¶ 16.)  The police, believing that D.T. and her husband were squatters, drew their firearms on D.T. and her husband, and placed D.T. and her husband in handcuffs.  (PSR ¶ 16.)

## C.  The Fraudulent FDIC Applications

In 2015, in furtherance of their scheme, the defendants submitted two false applications for FDIC insurance and certification, seeking to register DBNTC as an FDIC-insured bank.  (PSR ¶

17.)  As part of the application, the defendants falsely claimed that they each worked for DBNTC and were members of its board of directors.  (PSR ¶ 17.)  Neither Almaleh nor Iotova ever worked for DBNTC.  (PSR ¶ 17.)  Nor were they ever members of DBNTC's board of directors.  (PSR ¶ 17.)  The defendants also listed several other individuals as members of DBNTC's board of directors all of whom were not members of the board of directors.  (PSR ¶ 17.)  The defendants also falsely claimed in the applications that that they had a shareholder's meeting on November 2, 2013, on the 8th floor of 30 Wall Street in New York City.  (PSR ¶ 17.)  Neither the real DBNTC nor the defendants had an office at 30 Wall Street at that time. (PSR ¶ 17.)  In fact, on cross-examination, Almaleh stated that his alleged company had no shareholders at all.  (PSR ¶ 17.)

### D.  The Search and Arrest

On January 25, 2017, law enforcement officers arrested the defendants and executed a search warrant at the defendants' home in Florida.  (PSR ¶ 18.)  During that search, agents recovered, among many other things, dozens of fraudulent deeds; boxes of fake business cards, including cards in which Almaleh claimed to be Vice President of DBNTC; keys to properties that the defendants pretended to own; Almaleh's notary stamp; and fake stamps purporting to be from DBNTC that were used by the defendants to make their fraudulent documents look more authentic. (PSR ¶ 18.)

### E.  Post-Arrest Conduct

Even after the defendants were arrested in January 2017, they continued to perpetuate the scheme.  (PSR ¶ 19.)  Specifically, between April and August 2017, the defendants filed a series of lawsuits against financial institutions, attorneys, and individuals in Broward County, Florida. (PSR ¶ 19.)  The defendants' filings contained demonstrably false statements.  (PSR ¶ 19.)  For example, a motion to dismiss signed by Almaleh states that he is "a corporate officer and legal representative authority" for DBNTC, even though Almaleh has never worked at DBNTC.  (PSR ¶ 19.)

### F.  The Trial

On March 2, 2022, trial began against Almaleh and Iotova.  On March 14 and 15, 2022, Almaleh testified on his own behalf at trial.  (PSR ¶ 20.)  During both his direct examination and cross-examination, he testified and lied regarding the offense conduct.  (PSR ¶ 20.)  For example, Almaleh testified at trial that:

- He did own a company called DBNTC, that his company was the only legitimate DBNTC, and that the witness from the real DBNTC who testified at trial to being a vice president of the real DBNTC had no right to call himself a vice president of DBNTC;

- His company possessed properties worth $6.9 billion, but that he could not afford to make repairs to the properties he claimed to own;

- His company had an office at two different locations in New York City, although the proof at trial established that the defendants never had physical office space at either location and, to the extent there was a virtual office at one of the New York City locations, it was, at most, for a handful of months in 2015;

- He notarized his own signature on financial documents but that, when he was doing so, he was notarizing his purported "corporate" signature; and

- He did not meet several of the victims who testified at trial as having rented properties from the defendants and that the victims who testified were a well-organized group that wanted to present him in a bad light.  (PSR ¶ 20.)

On March 17, 2022, the jury returned a guilty verdict against the defendants on all counts. In particular, both defendants were found guilty of conspiracy to commit mail fraud and wire fraud (Count One), mail fraud (Count Two), wire fraud (Count Three), and making false statements to the FDIC (Count Four).

### G.  Sentencing

Sentencing is scheduled for January 18, 2023.  The Probation Department calculated a Guidelines range of 87 months to 108 months' imprisonment, and a criminal history category of I.  The offense level includes an 18-level enhancement, pursuant to Section 2B1.1(b)(1)(J) of the Guidelines, because the loss is approximately $5.7 million and a four-level enhancement, pursuant to Section 2B1.1(b)(2)(B) of the Guidelines, because the offense resulted in substantial hardship to five or more victims.  The loss is based on the assessed value or consideration paid for each of the approximately 29 properties over which the defendants falsely claimed ownership.  The Probation Department recommends a below-Guidelines sentence of 60 months' imprisonment.

The Government agrees with the Probation Department's calculation of the Guidelines range except in one respect.  Because Almaleh perjured himself at trial, the Government believes that, pursuant to U.S.S.G. § 3C1.1, two offense levels should be added.  Therefore, the Government believes Almaleh's Guidelines range is 108 months to 135 months' imprisonment.

The defendant requests a below-Guidelines sentence of time served, which would take into account the 30 months he has already served.  (Def. Sub. at 2.)

## II.  Discussion

### A.  Applicable Law

Facts relied on at sentencing for the purpose of calculating the applicable Sentencing Guidelines must be established by a preponderance of the evidence.  *United States v. Vaughn*, 430 F.3d 518, 525-26 (2d Cir. 2005).  Furthermore, "a sentencing court, like a jury, may base its fact-finding on circumstantial evidence and on reasonable inferences drawn therefrom."  *United States v. Gaskin*, 364 F.3d 438, 464 (2d Cir. 2004).

As always, the "sentencing court is afforded broad discretion in resolving disputed factual issues." *United States v. Ambrosio*, 129 F.3d 114, 1997 WL 701368, at *2, n.1 (2d Cir. 1997) (summary order) (citing *United States v. Ibanez*, 924 F.2d 427, 430 (2d Cir. 1991)). The sentencing court "is entitled to rely on any type of information known to it" in resolving sentencing disputes. *United States v. Tracy*, 12 F.3d 1186, 1203 (2d Cir. 1993) (citing *United States v. Carmona*, 873 F.2d 569, 574 (2d Cir. 1989)). At a sentencing hearing, the Federal Rules of Evidence do not apply, and the Court is not bound by rules governing hearsay, so long as the basis for the court's determination has indicia of reliability and is not otherwise contrary to a defendant's due process rights. *See United States v. Fatico*, 579 F.2d 707, 711 (2d Cir. 1978); *see also United States v. Martinez*, 413 F.3d 239, 242 (2d Cir. 2005) ("Both the Supreme Court and this Court, however, have consistently held that the right of confrontation does not apply to the sentencing context and does not prohibit the consideration of hearsay testimony in sentencing proceedings."). Rather, "[a]ny information or circumstance shedding light on the defendant's background, history and behavior may properly be factored into the sentencing determination." *Carmona*, 873 F.2d at 574 (citing *Williams v. New York*, 337 U.S. 241, 250–51 (1949)).

The Guidelines still provide important guidance to the Court following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Indeed, although *Booker* held that the Guidelines are no longer mandatory, it also held that they remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. *Booker*, 543 U.S. at 264. As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

After that calculation, however, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(l)-(7). See *Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B)     to afford adequate deterrence to criminal conduct;
(C)     to protect the public from further crimes of the defendant;
(D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

### B.   $5.7 Million Is the Correct Loss Amount

The Probation Department accurately calculates the loss amount to be used in the Guidelines analysis as $5.7 million.  This number is based on the assessed value or consideration paid for each of the approximately 29 properties the defendants stole, some of which they then rented out to individual victims.

For several reasons, the defendant argues that only the loss suffered by individual victim renters should be used for the Guidelines calculations.  (Def. Sub. at 4.)  Those arguments should be rejected.

First, the defendant claims that there is "inadequate evidence in the record" regarding the $5.7 million loss amount.  (Def. Sub. at 2, 4, 5.)  That is incorrect.  The evidence at trial established that the defendants prepared fake deeds for and therefore fraudulently claimed ownership of 29 different properties.  (*See* GX 1203 (summary chart of each of the fraudulent deeds).)  In other words, the defendants stole this property.  The loss associated with the stolen property is based on the assessed value or consideration paid for the deeds that were entered as exhibits during trial.  (*See, e.g.*, GX 101B at 13 (assessed value is $112,400); GX 121B at 12 (assessed value is $16,620).)  The defendant asks the Court to disregard the deeds of the property the defendants stole and instead rely on Iotova's testimony to determine how much money she purportedly paid for certain unrelated properties to determine the loss in this case.  (Def. Sub. at 5.)  However, putting aside whether Iotova actually purchased these properties, these properties do not fully encompass the 29 properties at issue in this case and thus should not be used for the loss calculation.

Second, the defendant claims that the sole victims that should be used for loss calculations are the "11 individuals who rented properties from the defendants."  (Def. Sub. at 3-4.)  The victims in this case include not only the individual victims who were scammed into renting property from the defendants, but also those victims, including financial institutions such as DBNTC, that owned or had title to the property that the defendants stole by preparing fraudulent deeds that transferred property to companies the defendants owned.  As a result, the loss calculation should not be limited to the losses suffered by the individual victims.

Third, the defendant asks this Court to disregard Second Circuit precedent and apply the Third Circuit's decision in *Untied States v. Banks*, 55 F. 4th 246 (3d Cir. 2022), to find that the Guidelines calculation should be based on actual loss, not intended loss.  (Def. Sub. at 5-6.)  In *Banks*, the Third Circuit cited the Supreme Court's decision in *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019), to find that it should apply the plain text of U.S.S.G. § 2B1.1—which directs courts to apply an enhancement based on "loss"—because a court must consider the plain text of the sentencing guidelines before turning to the commentary which, here, instructs courts to use "intended loss."  55 F. 4th at 255-57; *see also id.* at 257 ("The Guideline does not mention 'actual' versus 'intended' loss; that distinction appears only in the commentary.  That absence alone indicates that the Guideline does not include intended loss.").

This Court should reject the defendant's argument. As an initial matter, as discussed above, the trial evidence established that the defendants stole 29 properties. Thus, the value of the stolen property represents actual loss, not intended loss.

Moreover, even if the $5.7 million represented intended loss, the *Banks* decision is inconsistent with Second Circuit precedent and should be rejected. The Second Circuit and district courts within this Circuit have, even after *Kisor*, consistently applied the commentary on "intended loss" when calculating the Guidelines range. Specifically, the law is clear that, "[f]or the purposes of calculating the Guidelines range, loss is defined as 'the greater of actual loss or intended loss.'" *United States v. Powell*, 831 F. App'x 24, 25 (2d Cir. 2020) (quoting *United States v. Certified Envtl. Servs., Inc.*, 753 F.3d 72, 103 (2d Cir. 2014)). This makes sense because "the larger intended amount is a better measure for the defendant's culpability." *United States v. Lacey*, 699 F.3d 710, 720 (2d Cir. 2012). Indeed, as the defendant correctly notes (Def. Sub. at 5-6), in three post-*Kisor* cases, the Second Circuit has reaffirmed its deference to the Sentencing Guidelines commentary in its decisions that have held that the commentary to U.S.SG. § 4B1.2 remains valid. *See United States v. Wynn*, 845 F. App'x 63, 65 (2d Cir. 2021) (distinguishing *Kisor* and applying the Sentencing Guidelines commentary's statement that "controlled substance offenses" includes inchoate offenses), *as amended* (Apr. 1, 2021), *cert. denied*, 211 L. Ed. 2d 570, 142 S. Ct. 865 (2022); *United States v. Richardson*, 958 F.3d 151, 154-55 (2d Cir. 2020); *United States v. Tabb*, 949 F.3d 81, 87 (2d Cir. 2020), *cert. denied*, 141 S. Ct. 2793 (2021).

## C. The Obstruction Enhancement

Section 3C1.1 of the Guidelines provides:

> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels.

U.S.S.G. § 3C1.1.

A defendant's denial of guilt is not a basis for application of the § 3C1.1, except where the denial is "a denial of guilt under oath that constitutes perjury." U.S.S.G. § 3C1.1 cmt. n.2. It is long-settled that "[a] sentencing enhancement for obstruction of justice is warranted when a defendant testifying under oath 'gives false testimony concerning a material matter with the willful intent to provide false testimony.'" *United States v. Morrison*, 153 F.3d 34, 52 (2d Cir. 1998) (citation omitted). "The district court must determine by clear and convincing evidence that the defendant provided false testimony concerning a material matter with the willful intent to provide false testimony." *United States v. Savoca*, 596 F.3d 154, 159 (2d Cir. 2010) (internal quotation marks omitted).

Here, Almaleh testified falsely in front of the jury on several subjects. For example, as discussed above, he made many materially false statements about his purported employment at

DBNTC.  Almaleh falsely stated that, among other things, (i) he owned DBNTC, (ii) the company had property worth $6.9 billion, (iii) the vice president from DBNTC that testified at trial did not actually work at DBNTC, (iv) the company operated two physical locations in New York City. There is no evidence in the record that Almaleh ever worked at DBNTC, and, as Almaleh admitted to the Probation Department, he has been unemployed for the past 25 years.  As a result, the sentencing enhancement for obstruction of justice should apply to Almaleh's testimony.

### D.   The Court Should Impose a Below-Guidelines Sentence of at Least 60 Months' Imprisonment

The Government respectfully submits that a meaningful custodial sentence below the Guidelines range would be sufficient, but not greater than necessary, to achieve the legitimate purposes of sentencing.

*First*, a meaningful custodial sentence is necessary to reflect the seriousness of the offense, the nature and circumstances of the offense, and the need to promote respect for the law.  Over the course of several years, the defendants engaged in a multi-step and wide-ranging scheme to defraud financial institutions, individual renters, and the FDIC.  Almaleh, while pretending to be Vice President of DBNTC, prepared fake deeds which fraudulently transferred dozens of properties to companies owned by himself and his wife.  Almaleh tried to add legitimacy to these fraudulent deeds by notarizing the deeds with his notary stamp.  He even carried business cards claiming he was Vice President of DBNTC.

Once Almaleh and his wife had the fraudulent deeds, they set out to scam innocent victims by posting rental advertisements for these properties.  They often used the fake names of "Ana," "Anita," and "Michael" when talking to their victims.  Several victims—many of whom were poor—responded to these advertisements, signed rental agreements, and paid rent to the defendants in cash.  However, since the defendants did not actually own these stolen properties, the victims were promptly evicted by the police or the true owners.  When victims, like F.W., begged the defendants for their rent money back, the defendants simply ignored the victims.  In the case of F.W., this meant his family was homeless once again.  The financial hardship and emotional trauma suffered by the victims in light of these evictions cannot be understated.  (*See, e.g.*, Trial Tr. 340 (J.P. stating she felt "scared" when the police arrived to evict her family); *id*. at 244 (D.T. stating that the police held her up "at gunpoint" and told D.T. that she was staying at the property "illegally"); *id.* at 261 (D.T. stating she was handcuffed and escorted out of her rental home).)  A substantial sentence is necessary to account for the immeasurable harm Almaleh's conduct inflicted, separate and apart from the financial losses.

*Second*, a meaningful custodial sentence is necessary to afford adequate specific and general deterrence.  With respect to specific deterrence, while this is the defendant's first conviction, the defendant was warned over and over again that he was committing fraud.  For example, in 2015, victims F.W., J.P., and J.R. informed the defendants that they had been evicted from the property the defendants rented to them.  That same year, the defendants received court judgments informing them that they did not own property that they claimed to fraudulently transfer to themselves.  Despite the clear notifications that they were engaging in illegal conduct, the defendants continued to prepare and file fraudulent deeds which transferred ownership of property

to themselves.  (*See, e.g.*, GX 104B, 123B, 129B.)  Even after the arrest, the defendant continued to claim he worked for DBNTC.  He then proceeded to perjure himself at trial with a farfetched story and demonstrably false lies (while also at times refusing to answer questions at all).  Even worse, after the jury convicted Almaleh and his wife at trial, Almaleh still has not accepted responsibility for his conduct, and has shown absolutely no remorse for his individual victims.  He does all this despite admitting to the Probation Department that he has not been employed for the last 25 years.  Accordingly, a meaningful custodial sentence is necessary to ensure that the defendant does not commit additional crimes.  A meaningful custodial sentence is also necessary to deter others from participating in a multi-year scheme to rent stolen property to innocent victims.

Despite the above, the Government believes that there are mitigating factors that warrant a sentence below the Guidelines.  First, the defendant's advanced age and medical conditions are mitigating factors.  Second, while the Government believes the Guidelines are legally correct, when focusing on the harm caused to individual victims in this specific case, the Government agrees with the Probation Department that a sentence of 60 months' imprisonment would adequately serve the purposes of sentencing.

### III.    Conclusion

For the reasons set forth above, the Government respectfully requests that the Court impose a below-Guidelines sentence of at least 60 months' imprisonment.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

By:      /s/ Rebecca T. Dell
Rebecca T. Dell
Matthew J. King
Elizabeth A. Hanft
Assistant United States Attorneys
(212) 637-2198/2348/2334